HUMPHREYS et al. v. GREEN.   (No. 715.)

(Court of Civil Appeals of Texas. Beaumont. Nov. 3, 1921.)

**1. Evidence ⬤⟿183(15)—Evidence held to show proper search for lost deed.**

Evidence in trespass to try title that defendants had searched among the papers left by their ancestor for a deed in their chain of title, and had inquired of the heirs of the original grantee, *held* to show a sufficient search for the deed to render admissible the recital of such deed in another ancient instrument.

**2. Evidence ⬤⟿317(4)—Testimony as to information received in search for lost deed not hearsay.**

On the issue of proper search for a lost instrument, testimony as to information received from heirs of the original grantee of the instrument concerning search by them and inability to find the instrument is not hearsay.

**3. Evidence ⬤⟿372(8)—Ancient constable's deed is admissible without proof of judgment or execution.**

A deed executed by a constable 44 years before the trial is admissible in evidence without proof of the judgment and execution aside from the recitals of the deed, since the recited power under which an ancient instrument produced from proper source, was executed, will be presumed.

**4. Lost instruments ⬤⟿23(3) — Existence of deed may be proved without possession thereunder.**

The existence of a lost deed may be proved by circumstantial evidence without proof that possession was taken thereunder, where the land was wild and unoccupied and situated with other lands of the same character.

**5. Lost instruments ⬤⟿24 — Evidence held to raise jury question as to lost deed.**

In trespass to try title, circumstantial evidence *held* to raise a question for the jury as to existence of a lost deed in defendants' claimed chain of title, so that it was error to direct a verdict for plaintiff on the theory that defendants were naked trespassers.

**6. Evidence ⬤⟿589—Uncontradicted testimony of grantee as to lost deed not conclusive.**

The testimony of a party that his father had conveyed to him the premises in controversy by a deed which was subsequently lost is that of a highly interested witness, and therefore not conclusive as to existence of such deed, even though not contradicted.

Appeal from District Court, Liberty County; D. F. Singleton, Judge.

Trespass to try title by William Green against Geraldine Humphreys and another in which D. D. Green, as only child and sole devisee of William Green, was substituted as plaintiff after the death of the original plaintiff. Judgment for the plaintiff on directed verdict, and defendants appeal. Reversed and remanded.

E. B. Pickett, Jr., of Liberty, for appellants.

J. Llewellyn, of Liberty, and H. E. Marshall, of Houston, for appellee.

HIGHTOWER, C. J. This was an action of trespass to try title brought by William Green against Mrs. Geraldine Humphreys and her husband, in which the plaintiff sought to recover 100 acres of land off of the west end of survey or tract No. 4 out of the Richard Green league in Liberty county. The league was granted to Richard Green by the Republic of Texas in 1846, and after his death, which occurred prior to 1860, the league was partitioned by a judgment of the district court of Liberty county among Richard Green's several heirs. There were seven of these heirs, among them being a son, B. M. Green. The commissioners of partition set apart to B. M. Green about 657 acres, which was called or described in the judgment of partition as strip or survey No. 4, and this 100 acres in controversy in this suit is off of the west end of that strip. B. M. Green died in 1895, and left several children as his heirs, and one of his sons, William Green, was the original plaintiff in this suit, as before stated, and filed this suit in September, 1916. William Green died in February, 1919, and left as his only child the appellee, D. D. or Dan Green, who was also the sole devisee under the will of his father, William Green.

The answer of appellants in this case, as defendants below, consisted of a general demurrer, general denial, and plea of not guilty.

A jury was taken in the case, but upon conclusion of the evidence the trial judge peremptorily instructed a verdict in favor of the appellee, who had been properly substituted as the plaintiff in the case, and judgment was rendered accordingly. To the action of the court in peremptorily instructing a verdict against them, appellants duly excepted, and this appeal is prosecuted upon two assignments of error.

On the trial in the district court it was the contention of appellee, among other things, that B. M. Green, his grandfather, in 1861, executed and delivered to his father, William Green, a deed conveying to William Green the 100 acres in controversy, and that under the will of his father, William Green, this 100 acres of land passed to appellee himself. This claimed deed from B. M. Green to William Green was not produced, nor was any record copy of it offered in evidence, but the deposition of William Green, the father of appellee, was taken shortly after this suit was filed, and in the deposition William Green testified to the execution and delivery by B. M. Green of the deed as claimed. William Green further

---

testified, by deposition, that shortly after the deed was made to him by B. M. Green he built a small house upon the 100 acres of land in controversy, and moved into this house, he having just married, and lived there about six months, but that in December, 1861, he joined the Confederate Army, and was in the war during the remainder thereof, and that he never thereafter lived upon the land or had any character of possession thereof. He further testified that, when he was making preparations to go to the war, he decided to leave the deed executed by his father with the then county clerk of Liberty county, one P. K. Smith, and that he, in fact, turned over the deed to the clerk, thinking that it would be safer in his custody than elsewhere, and that sometime after his return from the war he inquired of the clerk for the deed and was told by the clerk that he could not find it, and that probably the deed was destroyed by fire when the deed records of Liberty county were destroyed on December 12, 1874. The apellee also in his testimony on the trial testified, substantially, that his father, William Green, had always claimed the 100 acres of land in controversy, and one A. C. Cherry also testified as a witness for appellee that in 1886 he was upon the land in controversy with William Green and offered to buy the land from William Green at that time, and William Green declined to sell it to him. By way of cross-interrogatories propounded to William Green he was asked whether or not he had paid any taxes upon the land in controversy, to which he replied that he had paid about 20 years' taxes on it, but he could not state when he had paid these taxes. He says:

"I have paid taxes on it less than 50 years ago. I have paid taxes on this land less than 40 years ago. I have paid on it since 30 years ago. It has been about 19 years since I paid any taxes that I can recollect."

There was no record evidence of any character showing that William Green had ever assessed this 100 acres of land for taxes, or that he had ever paid any taxes upon it. It is the contention of appellee here, however, that the instructed verdict in his favor was proper, even if it could not be properly said that the claimed deed to William Green from B. M. Green was established by the uncontradicted evidence, for the reason, as claimed by him, that it was shown by uncontradicted evidence that William Green was one of the children of B. M. Green, and that he inherited at least an undivided interest in the land, and that, as against a naked trespasser or one having no title, appellee was entitled to recover the whole of the survey in this suit. He also suggests that he was entitled to recover under the rule of prior possession. It is unnecessary that we should pass upon these points at this time, because

we are of the opinion that the trial court was in error in peremptorily instructing a verdict against appellants in this case, after having erroneously rejected material and proper evidence tendered by them in defense of this action.

It was the contention of appellants on the trial below that B. M. Green, appellee's grandfather, by his deed of date April 18, 1875, conveyed the 100 acres of land in controversy to one J. B. Simpson, who was at that time a resident of Liberty county, and that thereafter the title passed by legal chain to appellants. Appellants were unable to offer the claimed deed from B. M. Green to J. B. Simpson in evidence, claiming that same had been lost, but they sought to establish the execution of such claimed deed by circumstantial evidence. For that purpose appellants offered in evidence an original deed executed by George W. Slater, in his official capacity as constable of precinct No. 1 of Liberty county, Tex., dated the 1st day of February, 1876, which deed purported to convey the 100 acres of land in controversy to William F. Hardin. The deed in full, as tendered, reads as follows:

"State of Texas, County of Liberty.

"Know all men by these presents that whereas, by virtue of a certain execution issued by J. M. C. Lacour, Esq., justice of the peace for precinct No. 1 of the county of Liberty, in favor of Dr. S. M. Welch and against James B. Simpson, on a certain judgment rendered by said justice on the 6th day of September, A. D. 1875, and directed and delivered to me as constable of the county of Liberty, commanding me, of the goods and chattel, land and tenements of the said James B. Simpson, to make certain moneys in said writ specified, I, Geo. W. Slater, constable as aforesaid, did upon the 11th day of December, A. D. 1875, levy and seize all the estate, right, title, and interest which the said defendant, on the said 11th day of December, A. D. 1875, so had of, in, and to the premises hereinafter described, and on the first Tuesday of January, A. D. 1876, within the hours prescribed by law, sold said premises at public vendue in the county of Liberty, at the door of the courthouse thereof, having first given public notice of the time and place of such sale, by causing an advertisement thereof to be posted up at three public places in said Liberty county, one of which was the courthouse of said county for 20 days previous to said sale; and

"Whereas at said sale the said premises were struck off to William F. Hardin, of said Liberty county, for the sum of fifteen dollars, he being the highest bidder therefor, and that being the highest and best bid for the same:

"Now, therefore, in consideration of the premises aforesaid and of the payment of the said sum of fifteen dollars, the receipt of which is hereby acknowledged, I, Geo. W. Slater, constable aforesaid, have sold and by these presents do grant and convey unto the said William F. Hardin all the estate, right, title. and interest which the said Simpson had on the said 11th day of December, A. D. 1875, or at

any time afterwards, of, in and to the following described premises, to wit:

"One hundred acres of land situated in Liberty county on the west side of the Trinity river, about seven miles above the town of Liberty, being part of the Richard Green headright league and labor, and being off the west end of part No. 4, which was set apart to B. M. Green, as an heir of the said Richard Green, by decree of the district court of Liberty county, said 100 acres being the same conveyed to defendant by B. M. Green by deed dated April 18, 1875.

"To have and to hold the above-described premises unto the said William F. Hardin, his heirs and assigns, forever, as fully and as absolutely as I, as constable aforesaid, can convey by virtue of the said writ of execution.

"In testimony whereof I hereunto set my hand on this 1st day of February, A. D. 1876.
                    "G. W. Slater,
        "Constable for Precinct No. 1, Liberty Co.
"In presence of:
    "W. L. Douglass, ·
    "F. C. Usher."

The following important recitation in said deed was expressly insisted upon by appellants:

"Said 100 acres being the same conveyed to defendant by B. M. Green by deed dated April 18, 1875."

[1] It will be observed at once that this original instrument was about 44 years old, and there was no question on the trial and really no contention here that it did not come from the proper source. The introduction of this deed was objected to by appellee, and the objection promptly sustained. It had been shown beyond controversy that appellants were unable to produce the judgment of the justice court and the execution thereupon, or any copy thereof, under authority of which the constable's deed was executed, although, as shown by this record, proper search was made for such judgment and execution, and, in our opinion, appellants also showed proper search and inquiry for the claimed deed from B. M. Green to J. B. Simpson, but they were unable to produce the same, and were attempting to establish its execution by the recitations in this constable's deed, as an ancient instrument, together with such other facts and circumstances as they were able to produce for the purpose of establishing the execution of the claimed deed from B. M. Green to J. B. Simpson. It was shown, in fact agreed, that when W. F. Hardin died, in the year 1908, he left a will devising all his property to his sister, Miss Helen Hardin, who some few years thereafter married George W. Eaton, and Mrs. Eaton herself died in the year 1914, leaving a will in which she devised practically all her property, including the 100 acres of land in controversy, to her niece, Miss Geraldine Davis, who is now Mrs. Geraldine

Humphreys, one of the appellants in this case. It was shown that thorough and exhaustive search was made among all the William F. Hardin papers for the claimed deed from B. M. Green to J. B. Simpson. These papers had come down to Miss Helen Hardin, and thorough search among all of them was made for such claimed deed. It was also shown that the appellants in this case had made inquiry of Judge Robertson, of Dallas, who was a son-in-law of J. B. Simpson, for the claimed deed, and they were informed by Judge Robertson that most of Simpson's papers had theretofore been destroyed by fire, and appellants were unable to find any trace of this claimed deed among any papers belonging to J. B. Simpson.

[2] It is a fact, as argued by the appellee here, that it was not shown what had become of J. B. Simpson, whether dead or alive, but the fair and reasonable inference from this record is that he was dead, and that any further inquiry or search for the claimed deed on the part of appellants would have been useless, even if it should be conceded that J. B. Simpson, under the circumstances of this case, was the proper source to make search for the claimed deed. It will be remembered that the title to the land, if ever in him, could have been reposed there but for only a few months, and was divested out of him by the judgment and execution above mentioned, and he no longer had any interest in the land, or any reason for preserving the claimed deed from B. M. Green to himself; and we do not agree that the evidence on the part of Mr. Humphreys in this case to the effect that in making the search for this deed he was informed by Judge Robertson, the son-in-law of Simpson, of certain facts, was "rank hearsay." We think this testimony was admissible, and there was no objection to its admissibility as showing search and inquiry by the appellants in this case for the claimed deed from B. M. Green to Simpson, and that therefore such evidence was not simply "hearsay evidence," as that term is generally understood.

[3] Therefore we have concluded that the original deed from the constable to W. F. Hardin, being an ancient instrument, coming from the proper source, should have been admitted in evidence in its entirety, including the declaration by the constable that the land thereby conveyed was the same 100 acres that was conveyed by B. M. Green to J. B. Simpson by deed dated April 18, 1875. The deed of the constable purports to be executed under authority of the judgment and execution therein mentioned, and it seems to be definitely settled by the decisions of this state that a deed which is 30 years old and purports to be executed under a power is admissible in evidence, without proof that the power recited in fact existed. After

such a lapse of time, when it is shown that the deed comes from the proper source, it should be admitted as an ancient instrument, and the recited power under which it is executed will be presumed.

In Garner v. Lasker, 71 Tex. 431, 9 S. W. 332, among other things, it was said:

"The doctrine has been repeatedly recognized in this and other states that in most cases where a deed would be evidence as an ancient instrument, without proof of its execution, the power under which it purports to have been executed will be presumed."

See, also, Harrison v. McMurray, 71 Tex. 128, 8 S. W. 612; Dailey v. Starr, 26 Tex. 562; Ruby v. Von Valkenberg, 72 Tex. 466, 10 S. W. 514; Hensel v. Kegans, 79 Tex. 347, 15 S. W. 275; Robertson v. Brothers, 139 S. W. 658; West v. Loeb, 16 Tex. Civ. App. 399, 42 S. W. 614; and Huling v. Moore, 194 S. W. 191.

[4] It is also now firmly established by the decisions of the Supreme Court, as well as by all of the appellate courts of this state, that the execution and delivery of a deed to land may be proved by circumstances, and where the land involved is wild or vacant land and located in a community or vicinity where much of the surrounding land is of that same character, it is not necessary, in order to establish the execution of the claimed deed by circumstances, that there should have been actual possession of the land by the claimant under the deed sought to be presumed. In such a case the rule, stated substantially, is that, if from all the facts and circumstances introduced in evidence it is more reasonably probable that the claimed deed was executed than that it was not, then a jury trying the case or judge without the jury would be warranted in presuming in favor of the claimed deed and find accordingly. It is unnecessary to mention further authorities in support of this conclusion than the cases of Brewer v. Cochran, 45 Tex. Civ. App. 179, 99 S. W. 1033, and Magee v. Paul, 110 Tex. 470, 221 S. W. 256. The opinion in the Brewer v. Cochran Case was by the Galveston Court of Civil Appeals, speaking through Associate Justice Reese, and the conclusion and reason for the conclusion on that point in that case was made so clear that the Supreme Court, in Magee v. Paul, speaking through Associate Justice Greenwood, stated, substantially, that nothing could be said that would add anything to the strength of the reasoning of Judge Reese in discussing the rule in the Brewer-Cochran Case. See, however, Frugia v. Trueheart, 48 Tex. Civ. App. 513, 106 S. W. 738; Bounds v. Little, 75 Tex. 321, 12 S. W. 1109; Jones v. Reus, 5 Tex. Civ. App. 628, 24 S. W. 678; Herndon v. Burnett, 21 Tex. Civ. App. 25, 50 S. W. 581; Hutcheson v. Massie, 159 S. W. 317; Le Blanc v. Jackson, 161 S. W. 64; Houston Oil Co. v. Drumwright, 162 S. W. 1014; Dunn v. Epperson, 175 S. W. 841.

[5] Without discussing at all the character of title claimed by the plaintiff in this case, and assuming that the court would have been warranted in instructing a verdict in his favor had it been shown that appellants were but naked trespassers, we will now mention briefly a few facts and circumstances, but not all of them, which tend, at least with some probative force, to show that B. M. Green did execute a deed to J. B. Simpson, as claimed by appellants. The undisputed record in this case shows that William F. Hardin, the purchaser in the constable's sale made February 1, 1876, commenced assessing and paying taxes on this 100 acres of land at the proper time in 1877, and continued each and every year until the institution of this controversy to assess this land for taxes and pay the taxes, with the exception of the year 1882, and while it is admitted that Hardin, nor any of those holding under him, were ever in actual possession of the land until just shortly before the suit, still it was also shown that the land was wild and vacant, partly wooded and partly prairie like much of the other surrounding country, and therefore, as above stated, it was not necessary, in order to raise the issue for the determination of the jury as to the claimed deed, that actual possession should be shown. It was also shown without dispute that W. F. Hardin in 1905, three years prior to his death, executed a right of way deed to the Security Oil Company, authorizing that company to lay a pipe line across this tract of land, which deed promptly went of record, and this privilege was exercised by the Security Oil Company for a period of time between 10 and 11 years, with no protest from William Green or any other Green. Again, in 1913, Mrs. Eaton, who was formerly Miss Helen Hardin, executed a contract of tenancy to one McNeely. True, William Green, in his deposition in this case, testified that he never knew that W. F. Hardin had ever claimed this land until just before this suit was filed; yet the undisputed evidence in the record is to the effect that William Green, ever since he returned from the Confederate Army, lived within 2½ or 3 miles of this land on another survey, known as the Everett survey, where he owned between 65 and 75 acres of land, and the undisputed evidence is to the effect that during all this period of time there was no visible assertion of ownership by William Green to any portion of this 100 acres of land. He was asked, substantially, if he had ever as much as had a pig pen upon it or whether he had ever used any portion of it for a pasture, and he answered in the negative in both instances. It was shown, however, that as to the 65 or 75 acres owned by William Green on the

Everett tract, where he lived all these years, this home land was pretty regularly assessed by him for taxes, and this was shown by the records. The fact being undisputed in the record that William Green was a man in very indigent circumstances, some of the witnesses say "a very poor man," and no visible claim having been made to this land in all these years, and no attempt shown to trade it in any way or to realize anything on it, with the public records of the county, such as the tax records and others, showing an assertion of ownership under the Hardin claim, it certainly was sufficient in the opinion of this court to carry the issue to the jury as to whether B. M. Green executed the deed in favor of J. B. Simpson on April 18, 1875, as claimed by the appellants in this case.

[6] It will not do to say that, because William Green testified as he did by deposition in this case, that his father conveyed him the land in 1861, and that therefore there was no title in his father to convey to Simpson in 1875, there was no issue of fact for the determination of the jury on that point, because it must be remembered that William Green was a highly interested witness, being the party plaintiff in the case, and therefore it cannot be said that his evidence as to the execution and delivery of the deed to him by his father stands uncontradicted. It simply made an issue of fact on that point for the determination of the jury. It will also be remembered that A. C. Cherry, witness for appellee, never testified as to the execution of any deed by B. M. Green to William Green, but his testimony was simply to the effect that he was upon the land itself in the year 1886, and offered to buy it from William Green, and that William Green declined to sell it to him. It may be very true that William Green was setting up a claim to the land, as Cherry's testimony would indicate, but such testimony would not be conclusive on the issue on that point. Cherry also testified that he had a conversation with B. M. Green at the same time about the land, but he did not state that B. M. Green admitted to him that he had sold the land to William Green. In fact, Cherry only stated that he had a conversation with B. M. Green about the land in 1886, and as to what this conversation was, whether a declaration against his interest or not, does not appear. On this point the court could not have taken the issue from the jury.

We think we have said enough to make our disposition of the appeal now before us reasonably clear, and, without following counsel for either side further in the matter, we sustain appellants' first and second assignments of error, and hold that the judgment should be reversed, and the cause remanded, which is accordingly done.